Filed 9/18/23  In re A.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.M., et al., Persons Coming Under the Juvenile Court Law. | |
| | D081962 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3610DEFGH) |
| v. | |
| M.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Defendant M.M. (Mother) appeals from orders made pursuant to Welfare and Institutions Code,[1] section 322.26 that terminated her parental rights to five children.  Her sole contention is the juvenile court failed to apply the beneficial parent-child relationship exception to adoption, pursuant to section 366.26, subdivision (c)(1)(B)(i).  We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.      Petitions and Reunification Period

1. *Petitions*

This case involves a mother and her five young children. On July 21, 2020, the San Diego County Health and Human Services Agency (Agency) filed the initial petition alleging several section 300, subdivision (b) violations against Mother involving A.M. (almost 5 years old), P.M. (3 years old), Ere.M. (almost 3 years old), and Eri.M, (almost 1 year old).  On December 8, 2020, a second petition charged Mother with an additional section 300, subdivision (b) violation regarding her newborn, S.M.

As to the older four children, on July 19, 2020, police contacted Mother, father (P.M., Sr.) (Father)[2] and the children in a pickup truck.  The children were asleep in the back seat of the vehicle, while the parents lay naked, passed out in the vehicle's bed under a tarp.  Officers found a methamphetamine pipe next to Mother.[3]  Mother was pregnant.  The

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]     Father is the father of all five children subject to these proceedings. The court terminated his parental rights; he is not a party to this appeal.

[3]     Officers cited Mother for the pipe.

2

children wore "filthy," "soiled" diapers. Officers left the children with the parents that day.

On July 20, 2020, officers responded to a call regarding children in a pickup truck in a parking lot. On arrival, officers saw the same four children from the previous day. They wore diapers soiled with feces and urine to the point the diapers were "stretched out" or "sagging off the child's bottom." The children had dirty fingernails, lice, and "dirt caked on" to their face, necks, arms, legs, and feet. They also had bruises, bug bites, and sores all over their bodies. The truck was filled with trash including rotting food, spoiled milk, and soiled diapers. Mother admitted to having a "heavy addiction" to methamphetamine. The father admitted to using it "occasionally." They were both arrested for possession of a controlled substance and child cruelty. The Agency also reported multiple incidents of violent confrontations between the parents in the children's presence.

About five months later, Mother gave birth to S.M. S.M.'s umbilical cord tested positive for methamphetamine, amphetamine, morphine, and 6-acetyl morphine (a heroin metabolite).

The Agency filed petitions on behalf of all five children under section 300, subdivision (b), alleging substantial risk of harm due to Mother's and Father's substance abuse and domestic violence.[4] The juvenile court sustained the petitions, removed the five children from Mother's custody, and ordered supervised visitation and reunification services. These services included substance abuse treatment, domestic violence treatment, parenting classes, and random drug testing.

---

[4] On behalf of the four older children, the Agency also alleged one count under section 300, subdivision (g), for leaving them without any provision for support after police arrested Mother and Father. The juvenile court struck this allegation.

3

2.  The Children's Placements

The court detained A.M., P.M., Ere.M., and Eri.M. at Polinsky Children's Center until August 14, 2020, when they were placed in paternal grandparents' care.  The court detained S.M. in a temporary home for a short period until January 6, 2021; the court then detained S.M. with the adoptive parents of Mother's three other children.[5]

Medical professionals diagnosed A.M. with autism and intellectual disability; she also was nonverbal.  P.M. was diagnosed with autism, posttraumatic stress disorder, and serious developmental delays.  They both received services to learn emotional regulation and to process trauma.  P.M. was also "extremely overweight" and attended monthly weight management appointments.  Ere.M. and Eri.M. had minor speech concerns and received speech therapy.  There were no developmental concerns for S.M., however, she needed a hip harness, a helmet, and glasses.

All five children did well in their placements.  By January 2021, the four older children were calling paternal grandmother "mom" or "mama."  She demonstrated commitment to their care and a willingness to adopt.[6]  S.M. thrived with her caregivers who also expressed a desire to adopt.  By August 2021, S.M. was bonded to her half siblings, with her caregivers describing S.M. as an easy, happy baby.

---

[5]  In November 2014, due to her substance abuse, the court terminated Mother's parental rights to three other children.  S.M. could not be placed with paternal grandparents because they already had too many minors in the home.

[6]  Paternal grandfather passed away during the reunification period.

4

### 3. Reunification Services

Immediately after filing the petitions, the Agency and the juvenile court advised Mother that due to the children's ages, the court might allow her only six months to participate in, and make substantial progress in, reunification services. Mother engaged with those resources. Sometimes her efforts yielded good progress and sometimes Mother showed periods of decline. Ultimately, the court extended Mother's reunification services beyond six months. Mother completed the parenting education program and the substance abuse outpatient program in February 2022, about one year and four months after the four older children were removed from her custody. She finished the domestic violence program in March 2022.

In April 2022, Mother tested positive for methamphetamines raising concerns that with less "hand-holding" from her substance abuse program, Mother relapsed. And Mother's program participation became inconsistent; Mother's poor attendance correlated to her April 2022 positive drug test. Similarly, Mother completed parenting education and improved in that area, but then subsequently her abilities declined. After two years receiving reunification services, a substantial risk of detriment to the children's safety remained if the children returned to Mother's custody. The court terminated Mother's reunification program in July 2022, starting the children's permanent placement planning phase.

## B. Permanency Planning Period

During the permanency planning period, Mother visited with S.M. on Tuesdays, all five children on Wednesdays, and two of the four older children

on Thursdays.[7]  The Agency reported that Mother took a passive role during visits.  She presented as kind, loving, and caring, but her relationship with the children was that of a relative who visits periodically.  The Agency determined that although there would be a level of loss from severing the children's relationship with Mother, the permanency provided by adoption outweighed it.  After removal from Mother's primary care, the children showed significant progress with their individual challenges due to the consistency and security caregivers gave them.  And the caregivers were committed to adopting the children.

At the permanency planning hearing in April 2023, Mother testified about her understanding of each child's individual needs and how she attempted to manage them.  For example, she explained that P.M. needs "to get air" when he gets angry.  Ere.M. likes to be hugged.  Mother expressed that "when they get older, I'm pretty sure they're going to want to see me.  [¶] Maybe not right now, but maybe [in] a couple years from now."  Mother's counsel argued the benefit of continuing the children's relationship with Mother outweighed the benefit of adoption.

The court found that all five children were generally and specifically adoptable.  The court then examined whether the parent-child relationship exception to adoption existed.  First, the trial judge found Mother maintained regular and consistent visitation.  Second, the trial court turned its attention to whether Mother showed a positive bond and attachment.  The court explained it is required to look at this issue from the child's current perspective.  The trial court determined that while Mother showed a desire to help the children, there was no evidence of them looking to her for that

7    Due to the children's needs and Mother requiring extra support, the visitation center was only able to supervise the older children on Thursdays, two at a time.  This necessitated a bi-weekly rotation schedule for them.

assistance. The court concluded there was insufficient evidence to find a positive attachment existed. Finally, the court noted if a beneficial relationship existed with Mother, then termination of her parental rights would be detrimental, but the facts did not support that finding. Concluding no exception to adoption applied, the court terminated Mother's parental rights as to all five children and ordered the permanent adoption plan.

DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parent-child relationship exception did not apply. We disagree. Substantial evidence supports the court's finding that the children did not have a significant, positive, emotional attachment to Mother such that they would benefit from a continuing relationship with her.

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]' " (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At a permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or place children in longterm foster care. If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Ibid.*; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) Once the juvenile court finds the child is adoptable, the burden shifts to the parent to demonstrate that a statutory exception applies. (*In re B.D.*, at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate

7

parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

One exception is when a beneficial parent-child relationship exists. (§ 366.26, subd. (c)(1)(B)(i).) It applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) This exception requires the parent to prove three elements: "1) regular visitation and contact [with the child,] taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225 [citing to *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*)].) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, at p. 640, citations omitted.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court

8

abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Here, the juvenile court found Mother satisfied the first element of regular visitation and contact with the children. The Agency conceded this point below and does not challenge it on appeal.

We now examine the second element where the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [italics added].) Courts consider factors including the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Mother attacks the court's decision on this factor for two main reasons. First, she argues the juvenile court erred because it failed to describe exactly on what evidence it relied when finding that the children did not have a significant, positive, emotional attachment to Mother. However, when finding the parent-child relationship exception inapplicable a court is not required to recite its grounds, reasons, or specific findings regarding any of the elements. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 ["Further, we are aware of no requirement . . . that the juvenile court, in finding the parental-benefit exception *inapplicable,* must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. To the contrary, we infer from section 366.26, subdivision (c)(1)(D) . . . that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental" [Citation omitted], italics added.].)

9

The cases Mother cites are inapposite. Those cases dealt with orders terminating parental rights by using an improper "parental role" analysis rather than focusing on the parent-child relationship. (See *Katherine J.*, *supra*, 75 Cal.App.5th at p. 319 ["However, this ["parental role" analysis] has the potential to create more problems than it solves."]; see also *In re D.M.* (2021) 71 Cal.App.5th 261, 269; and *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 209.) Here, the court correctly eschewed the "parental role" approach explaining the question is not can Mother be a parent or assume parental responsibility for the children, but whether there is a positive bond and attachment from child to parent.

Second, Mother argues the court's findings here are wrong because the record contained sufficient evidence that the children enjoyed a positive attachment to Mother. She contends the children and she had good visits, the children were excited to see her, they showed affection to her with hugs and kisses, and the four older children called her "Mom" or "Mommy." Mother also argues her testimony showed she was sensitive to the children's various special needs and the children benefitted from their Mother knowing who they were and their individual requirements.

We affirm a lower court's finding if supported by substantial evidence even though other evidence may support a different result. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Here, substantial evidence supports the juvenile court concluding the children did not have a significant, positive, emotional attachment to Mother. At the time of the section 366.26 hearing in April 2023, A.M. was seven, P.M. was six, Ere.M. was five, and Eri.M. was three years old. They had not lived with Mother for two years and eight months. S.M. was two. She did not spend any portion of her life in Mother's care.

Also, while Mother had positive interactions with the children during visits, the reports also show the children did not display distress upon separating from Mother and did not ask for her between visits. Upon arriving to a visit, the children would sometimes ignore Mother or simply greet her as they passed her on the way to activities. When Mother arrived to a visit after the children, they sometimes did not acknowledge her. And they displayed no distress while waiting for Mother when she arrived late to visits.

The evidence also shows that during visits, the children were more occupied with the activities or eating than interacting with Mother. They only showed distress at the end of visits when they were crying over a toy or activity they had to leave behind. While Mother argues the children benefited from her insight into their special needs, the evidence does not show that the children relied on her to fulfill those needs. To the contrary, they often sought help, comfort, or affection from paternal grandmother or the social worker. Mother in this situation must show more than "frequent and loving contact, an emotional bond with the child, or pleasant visits." (See *In Re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) Substantial evidence supports the court's finding that the children do not have a significant, positive, emotional attachment to Mother.

We turn to the last element of the beneficial parent-child relationship exception. It requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Id.* at p. 632.) The juvenile

11

court must decide "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home . . . ." (*Ibid.*)

When reunification services terminate, the focus shifts from family preservation to promoting the children's best interest, including the children's interest in a stable, permanent home. (*In re Fernando M.*, *supra*, 138 Cal.App.4th at p. 534.) Based on this approach, there is a strong preference for adoption. (*Ibid.*) Moreover, we must affirm the court's determination that the parent-child relationship exception to adoption does not apply unless it was arbitrary, capricious, or patently absurd. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) It was not.

Mother contends it would be detrimental for the children, who had special needs, to disrupt the routine of consistent contact with her. She acknowledges the children did not experience difficulty separating from her after visits but argues this is because they had become accustomed to visiting with her several times a week, so they expected to see Mother again. She claims the children would likely suffer detriment if that consistent routine and relationship were disrupted. Based on the facts we discussed above, we disagree.

Changing the children's current routine or severing their relationship with Mother does not outweigh the benefit the children would gain from the stability an adoptive home offers. The evidence shows the four older children are thriving in paternal grandmother's home where they have lived over two and a half years. A.M. and P.M. expressed their desire to remain with paternal grandmother. Ere.M. and Eri.M. are also happy and well-adjusted.

12

All four of the older children call paternal grandmother "mama."  Similarly, S.M. is happy and well-adjusted in the home in which she has lived her entire life.  She calls her caregivers "[m]ama and [d]ada."  She calls her half siblings her "[h]ermanas" (Spanish for "sisters").  Although Mother argues there is no evidence that the stability of the children's placement would be jeopardized if her parental rights remained intact, that is not the applicable standard when adoption is the statutorily preferred permanent plan.

The record here does not support a conclusion that this is an extraordinary case where preservation of the parent's rights should prevail over the Legislature's preference for adoptive placement.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)  Accordingly, the court did not abuse its discretion terminating Mother's parental relationship after declining to apply the beneficial parent-child relationship exception to adoption.

DISPOSITION

The orders are affirmed.

RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

13